# In the United States Court of Federal Claims

Consolidated Nos. 19-231L / 19-258L
(Filed: February 6, 2020)

| | |
|---|---|
| STATE OF MISSISSIPPI, *et al.* ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | Keywords: Motion to Dismiss; RCFC 12(b)(6); RCFC 12(b)(1); Takings Clause; Fifth Amendment; Flooding; Standing. |

*John W. Barrett*, Barrett Law Group, P.A., Lexington, MS, for Plaintiff. *David McMullan, Jr.*, Barrett Law Group, P.A., Lexington, MS, *Jonathan W. Cuneo*, *Mark Dubester*, *Jennifer E. Kelly*, Cuneo, Gilbert, & Laduca, LLP, Washington, DC, *Jerry Abdalla*, Abdalla Law, PLLC, Ridgeland, MS, *Richard Barrett*, Law Offices of Richard R. Barrett, PLLC, Oxford, MS, and *Robert J. Cynkar*, McSweeney, Cynkar & Kachouroff, PLLC, Of Counsel.

*Davené D. Walker*, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Jacqueline C. Brown*, *Brent H. Allen*, Natural Resources Section, Environmental and Natural Resources Division, and *Lawrence Vandyke*, Deputy Assistant Attorney General, U.S. Department of Justice, Washington, DC.

**OPINION AND ORDER**

**KAPLAN, Judge.**

Plaintiffs in these consolidated cases allege that they suffered a taking of their properties by flooding as result of the Army Corps of Engineers' (the "Corps") construction and operation of a set of structures known as the "Old River Control Structure" (the "ORCS" or the "Structure") on the lower Mississippi River. The Corps built the Structure to avert the catastrophic economic consequences that would have ensued if no actions were taken to prevent the waters of the Mississippi from being captured by the Atchafalaya River.

Plaintiffs in Case No. 19-231 include the State of Mississippi, its Secretary of State and Attorney General (in representative capacities), and several county school districts. State of Mississippi's Am. Compl. (hereinafter "Miss. Am. Compl.") ¶¶ 10–16, ECF No. 8. The county school districts "have control and jurisdiction over the Public School Trust Lands situated within their respective school district boundaries." Id. ¶ 10. The Public School Trust Lands at issue in this case are located in Natchez-Adams, Claiborne, Jefferson, and Wilkinson counties, approximately 6 to 106 miles upriver from the ORCS. Id. ¶¶ 10–17.

The Plaintiffs in Case No. 19-258 are the trustee and beneficiaries of the J. Kelley Williams Revocable Trust UAD 1991 (the "Williams Trust" or the "Trust"). J. Kelley Williams Revocable Trust UAD 1991, et al. Am. Compl. (hereinafter "Williams Trust Am. Compl.") ¶ 10, ECF No. 7. The Trust owns land twenty miles upstream of the Structure. Id. ¶ 11. Plaintiff James Kelley Williams is the trustee and has a reversionary interest in the Williams Trust. Id. ¶¶ 10–11. Plaintiffs James Kelley Williams, Jr., George Pittman Williams, and Clifford Calhoun Williams are beneficiaries of the Williams Trust. Id. ¶ 10.

Plaintiffs in both cases allege that the construction and operation of the Structure caused sediment to accumulate in its vicinity, which obstructed the flow of the river, thereby increasing the height of the river bed, narrowing the channel, and ultimately resulting in flooding of their properties that would not otherwise have occurred. Plaintiffs acknowledge that the land at issue has historically been subject to seasonal flooding but allege that—because of the construction and operation of the Structure—the flooding is now more frequent, extensive, and damaging and has deprived them of the use and value of their properties.

The government has moved to dismiss Plaintiffs' claims for lack of standing pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). The government contends that the allegations in the amended complaints fail to establish that any of the Plaintiffs possess the requisite ownership interest in the land that has allegedly been taken. The government also asserts that, in any event, the amended complaints should be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim. Specifically, the government contends that the Plaintiffs were required to "pinpoint" the exact government action that gave rise to their takings claims in their amended complaints but have failed to do so, and that their amended complaints are deficient because they do not include allegations that address the mitigating effects of other flood-reduction measures the Corps has undertaken on the lower Mississippi River. In addition, according to the government, the claims stated in the amended complaints are not takings claims but are, at best, torts.

For the reasons set forth below, the Court **DENIES in part** and **GRANTS in part** the government's motion to dismiss under RCFC 12(b)(1). Other than the Williams Trust beneficiaries, all Plaintiffs have standing to pursue their claims. Plaintiffs' allegations regarding the effects of the Corps' actions on their properties, taken as true, state a claim for relief under the Fifth Amendment. Therefore, the government's motion under 12(b)(6) is denied.

# BACKGROUND[1]

## I. Plaintiffs' Factual Allegations

### A. The Old River Control Structure

In 1954, the Corps advised the United States Congress that the flow of water in the lower Mississippi River was increasingly diverting into the neighboring Atchafalaya River, which provided a shorter and steeper route into the Gulf of Mexico. Miss. Am. Compl. ¶ 1. Had this process continued unchecked, the lower Mississippi River would have been reduced to a polluted rivulet, and the Atchafalaya would have replaced it as a major waterway. Id. The ports of Baton Rouge and New Orleans would have ceased to be operable, resulting in enormous economic loss for the region and economic disruption on a national scale. Id.

In response to this potential economic catastrophe, Congress enacted the Flood Control Act of 1954, Pub. L. No. 83-780, § 201, 68 Stat. 1259, 10. That act mandated that the Corps intervene to maintain what was then an approximately 70-30 flow ratio of the Mississippi River to the Atchafalaya. Id. ¶¶ 2–3.

In response, the Corps built and has since maintained a combined set of structures known as the Old River Control Structure. Id. ¶ 4. The ORCS includes a "low sill" structure and an "overbank structure," both of which began operations in approximately 1963, and an "auxiliary structure" that was completed in 1986. Also at the location is a privately owned and operated power plant that went into service in approximately 1990. Id. ¶ 31.[2]

The various dams and waterways that comprise the ORCS were designed to control and limit the volume of water flowing from the Mississippi River to the Atchafalaya, to ensure—consistent with the congressional mandate—that the Atchafalaya does not "capture" the Mississippi River. Id. ¶ 30. In general, the Corps limits the amount of the Mississippi River that flows into the Atchafalaya to approximately twenty-three to twenty-five percent of the volume of the Mississippi River, in compliance with statutory requirements. Id.

---

[1] The facts set forth below are based on the allegations in the Williams Trust and the State of Mississippi Amended Complaints. ECF Nos. 7, 8. The Court will primarily cite to the State of Mississippi Amended Complaint, which contains almost identical factual and legal allegations as the Williams Trust Amended Complaint.

[2] The government states that the power plant (the Sidney A. Murray, Jr. Hydroelectric Station) is a "non-Federal, privately-owned and privately-operated element." United States' Mot. to Dismiss ("Def.'s Mot.") at 6 n.6, ECF No. 9. In its motion, the government uses the term "Old River Control Structure" to refer to the Federal project structures of what the Plaintiffs term the "Old River Control Complex"—a term that also includes the private power plant. Id.

### B. Accumulation of Sediment Caused by the ORCS Impedes the River's Flow and Raises Water Levels Upstream

During the design of the ORCS, the Corps conducted numerous studies and convened working groups of experts in sediment transport and riverine hydrology to study the impact of the ORCS. Id. ¶ 36. The Corps' intent was to design the Structure to control the flow of sediment into both the Atchafalaya and Mississippi Rivers. Id. ¶ 34.

Several facts were well known when the ORCS was designed: 1) that sediment suspended in water would travel with the flow; 2) that sediment located at or near the channel bed was more likely to be trapped upstream of an obstruction, and lead to sediment accumulation, thereby aggrading the channel bed;[3] 3) that the greater the flow of a river, the larger the volume of sediment the water transports; and 4) that the ORCS would impact sediment transport on the Mississippi River. Id. ¶¶ 35–36.

Over the years since the Corps built the ORCS, massive amounts of sediment have gradually accumulated in the Mississippi River in the vicinity of and below the ORCS. Id. ¶¶ 6, 40. This has occurred because in designing and operating the ORCS to maintain the ratios for the diversion of the Mississippi River to the Atchafalaya, the Corps has not been able to fully replicate the natural flow of sediment. Id. ¶ 39. Because the quantities of sediment that can pass through the Structure are limited, sediment accumulates in the vicinity of the ORCS and backs up on the Mississippi River side of the Structure. Id. Further, the flow remaining in the Mississippi River is insufficient to move this backed-up sediment. Id. The sediment accumulation has narrowed the banks, raised the elevation of the river, and created extensive sand bars and other obstructions that impede the river's flow and raise water levels upstream of the ORCS, where Plaintiffs' properties are located. Id. In sum, Plaintiffs allege, the ORCS "obstructed the natural water and sediment flow of the Mississippi River, constrained its ability to carry water without hindrance, which in turn has created a bottleneck, causing waters to back up upstream of the ORC[S], resulting in increased flooding of [Plaintiffs' properties]." Id. ¶ 32.

The Corps has acknowledged the buildup of sediment near the Structure. Id. ¶ 41. In June of 2015, it issued a report entitled "Old River Control Complex Sedimentation Investigation," (the "Report") which concluded that sediment diversion at the ORCS is less efficient than required to maintain channel stability in the Mississippi River. Id. ¶ 42. The Report detailed the aggradation of the Mississippi River channel in the immediate vicinity of the three inflow channels of the ORCS, noting that the most drastic change occurred in the portion of the river between the hydropower channel and the low sill channel, where the river bed aggraded from an elevation of approximately seventy-five feet below sea level to thirty feet below sea level between 1975 and 2008. Id. ¶ 44.

---

[3] In their response brief, Plaintiffs explain that "[g]eologists use the term 'aggradation' to define the increase in the river bed due to the 'deposition' of sediment. Aggradation occurs where the supply of sediment is greater than the amount that the river is able to transport." Pls.' Opp'n to the United States' Mot. to Dismiss at 6 n.4, ECF No. 10.

### C. Rising Water Levels Upstream Cause Flooding of Plaintiffs' Land that is More Frequent, Severe, and Destructive than the Occasional Seasonal Flooding that Previously Occurred

Plaintiffs allege that the accumulation of sediment has created an obstruction to river flow that causes the river level upstream to rise, creating and exacerbating flooding on the Plaintiffs' properties. Id. ¶ 62. As a result of the accumulation of sediment, Plaintiffs claim, what were once occasional seasonal floods have so increased in frequency, severity, and duration that the river waters now inundate Plaintiffs' properties for months at a time. Id. ¶¶ 6–7, 48–52. This has substantially impaired their ability to grow timber, soybeans, and other crops on their properties and to engage in other economically beneficial uses of the properties, such as oil exploration and production. Id. ¶ 7. Additionally, Plaintiffs' enjoyment of their properties has been hindered, including interference with their ability to hunt. Id.

## II. This Action

Plaintiffs, the State of Mississippi, et al., filed their complaint on February 11, 2019. ECF No. 1.[4] Plaintiffs J. Kelley Williams Revocable Trust UAD 1991, et al., filed their complaint on February 15, 2019. Case No. 19-258, ECF No. 1. The two cases were consolidated on March 13, 2019. Case No. 19-258, ECF No. 5. Thereafter, on May 9 and 10 respectively, the Trust and the State of Mississippi Plaintiffs filed amended complaints. ECF Nos. 7, 8.[5]

On July 12, the government filed a motion to dismiss ("Def.'s Mot.") in both cases pursuant to Rules 12(b)(1) and 12(b)(6) of the Court of Federal Claims. ECF No. 9. Plaintiffs filed their opposition on August 2, 2019. ECF No. 10. The government filed its Reply in Support of its Motion to Dismiss ("Def.'s Reply") on August 30, ECF No. 16, and, with leave of the Court, the Plaintiffs filed their Sur-Reply to United States' Reply in Support of its Motion to Dismiss on September 6, ECF No. 19.

Oral argument was held on the government's motion on January 28, 2020 at the courthouse for the United States District Court for the Southern District of Mississippi in Natchez, Mississippi. At the close of the argument, the Court indicated that it intended to deny the government's motion to dismiss for reasons to be specified in this opinion.

## DISCUSSION

### I. Jurisdiction

The Tucker Act authorizes the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any

---

[4] Unless otherwise noted, all citations are to Case No. 19-231.

[5] Since these cases were filed, at least three other related cases have been filed in this court. See Compl., Bowen v. United States, Case No. 19-1812 (filed on November 26, 2019); Compl., Ard et al. v. United States, Case No. 19-1968 (filed on December 30, 2019); Compl., Bancroft Enterprises, LLC, et al. v. United States, Case No. 20-30 (filed on January 10, 2020).

regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Claims for damages under the Takings Clause of the Fifth Amendment are within this Court's Tucker Act jurisdiction. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12, (1990); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005).

To pursue a takings claim, a plaintiff must possess "a property interest for purposes of the Fifth Amendment." Members of the Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002)). Whether a plaintiff possesses a property interest is determined by reference to state law. Preseault v. United States, 100 F.3d 1525, 1534 (Fed. Cir. 1996); see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001 (1984) ("[p]roperty interests . . . are not created by the Constitution"; instead, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law") (internal quotations omitted).

In its motion to dismiss, the government contended that "[s]everal" of the Plaintiffs did not plead facts sufficient to establish their standing to sue, but it did not identify which Plaintiffs it was referencing. Def.'s Mot. at 25. In its reply, the government clarified that its objections based on standing apply to all of the Plaintiffs in both cases. Def.'s Reply at 21–22. According to the government, "[a]t no point do Plaintiffs allege that any of these parties, or the State of Mississippi own specific property interests that were alleged[ly] taken, much less identify the property with the requisite specificity." Def.'s Reply at 22. For the reasons set forth below, the Court agrees that the beneficiaries of the Williams Trust lack standing but rejects the government's arguments as to all other Plaintiffs in both cases.

As to the Plaintiffs named in the Williams Trust Amended Complaint, the Court determines that Plaintiff James Kelley Williams, as trustee of the J. Kelley Williams Revocable Trust, has standing to bring suit on behalf of the Trust and its beneficiaries. See, e.g., The George Family Tr. ex rel. George v. United States, 91 Fed. Cl. 177 (2009) (takings claim brought by trustees on behalf of trusts); see also Miss. Code § 91-8-811(a) ("A trustee shall take reasonable steps to enforce claims of the trust"); Restatement (Third) of Trusts § 107 cmt. b (Am. Law Inst. 2012) ("As holder of the title to trust property . . . , and as the representative of the trust and its beneficiaries, the trustee is normally the appropriate person to bring . . . an action against a third party on behalf of the trust.").

The Plaintiff-beneficiaries of the Williams Trust, however, do not have standing to bring this suit. See Cane Tenn., Inc. v. United States, 60 Fed. Cl. 694, 701 (2004) (finding in a Fifth Amendment takings case that the beneficiaries of an express trust had "only an equitable interest" and did "not have legal ownership of the trust property," and therefore the trustee "rightly [is] the legal representative" of the trust). Further, the Restatement (Third) of Trusts explains that a "beneficiary has no standing to sue a third party on behalf of the trust," except in limited circumstances that do not apply here. § 107 cmt. b. In their sur-reply, Plaintiffs cite Hemphill v. Mississippi State Highway Commission, 245 Miss. 33, 47–48 (1962), for the proposition that a future interest in property can constitute a present interest for the purposes of eminent domain. That case, however, dealt with whether compensation could be awarded to individuals with an executory interest in property—an issue that is distinct from whether a beneficiary of a revocable trust has a cognizable property interest sufficient to confer standing

for a Fifth Amendment taking. See id. The Court therefore holds that the trustee is the appropriate legal representative of the Trust, and that the beneficiaries lack standing and must be dismissed from this case.

The government's arguments as to the State of Mississippi Plaintiffs, however, lack merit. In the State of Mississippi's Amended Complaint, the Plaintiffs allege that the lands at issue (which they identify specifically by their coordinates) are Public School Trust Lands (also referred to as "sixteenth-section" lands). Under Mississippi law, the state holds absolute title to sixteenth-section lands in trust for the benefit of the public schools in the state. Jones Cty. Sch. Dist. v. Dep't of Revenue, 111 So. 3d 588, 595 (Miss. 2013) (quoting Miss. Code § 29-3-1(1) (Rev.2010)).

Further, as alleged in the amended complaint, under Mississippi law, the Secretary of State is the "Public School Trust Lands supervisory Trustee" and is responsible for "overseeing the management of the [Public School Trust] lands." Miss. Am. Compl. ¶ 11. See Jones Cty. Sch. Dist., 111 So. 3d at 595–96 ("The State, as titleholder, has delegated general supervisory authority over [the Public School Trust Lands] to the Secretary of State."). The Secretary of State therefore has standing to bring suit in his official capacity to represent the State's interests with respect to sixteenth-section lands. See id. at 596 (noting that the Secretary of State participates as a party in representative capacity in connection with tax litigation arising from oil drilling on sixteenth-section lands).

Moreover, according to the amended complaint, Attorney General Jim Hood has the authority under the Mississippi Constitution to act on the State's behalf as the titleholder, pursuant to the authority granted to his office by Mississippi Constitution, Art. 6, § 173 (1890) and by Mississippi Code, § 7-5-1. Miss. Am. Compl. ¶ 12. The government's motion to dismiss the Attorney General's claim on behalf of the State of Mississippi therefore also lacks merit.

Finally, the county "[s]chool boards . . . stand as 'trustees and as trust supervisors or managers'" of the Public School Trust Lands. Jones Cty. Sch. Dist., 111 So. 3d at 596 (quoting Hill v. Thompson, 564 So. 2d 1, 7 (Miss. 1989)). As trustees, and because they have the exclusive right to exclude, use, and benefit from the sixteenth-section lands, the county school districts have standing to bring their takings claims. Peanut Quota Holders Ass'n, Inc., 421 F.3d at 1330 (The "'background principles' and 'rules and understandings'" that determine the existence of a property interest "focus on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of the property.") (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992)).

The Court therefore grants the government's motion to dismiss for lack of standing as to the beneficiaries of the Williams Trust—namely, Plaintiffs James Kelley Williams, Jr., George Pittman Williams, and Clifford Calhoun Williams. The Court denies the government's motion to dismiss for lack of standing as to all other Plaintiffs in these consolidated cases.

## II. Standards for Motions to Dismiss Pursuant to RCFC 12(b)(6)

A complaint may be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, and must indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).

"To avoid dismissal" under RCFC 12(b)(6), "a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

Due to the fact-intensive nature of takings cases, Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005), discovery is often "necessary to determine whether plaintiffs' allegations demonstrate a taking and, therefore, plaintiffs should be given the opportunity to develop facts in support of their claims." Orr v. United States, 145 Fed. Cl. 140, 158 (2019). The Court should therefore exercise care in takings cases not to deny Plaintiffs that opportunity by the precipitous grant of motions to dismiss under RCFC 12(b)(6).

## III. Legal Framework for Takings Cases

The Fifth Amendment's Takings Clause provides that "private property" shall not be "taken for public use, without just compensation." U.S. Const. amend. V. The purpose of the clause is to prevent the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123 (1978).

To establish entitlement to compensation under the Takings Clause, a plaintiff must show: 1) that he has "a property interest for purposes of the Fifth Amendment," Peanut Quota Holders Ass'n, 421 F.3d at 1330 (citing Conti, 291 F.3d at 1339), and 2) that the government's actions "amounted to a compensable taking of that property interest." Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

A physical taking is effected by "a direct government appropriation" or "physical invasion" of private property. Tahoe-Sierra Pres. Council Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 314, 318 (2002). It is well-established that such a physical taking may occur where "real estate is actually invaded by superinduced additions of water . . . so as to effectually destroy or impair its usefulness." Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. 166, 181 (1871). Further, regularly recurring flooding, such as that alleged in this case, may "g[i]ve rise to a takings claim no less valid than the claim of an owner whose land was continuously kept under water." Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 32 (2012) (citing United States v. Cress, 243 U.S. 316, 328–329 (1917)).

Plaintiffs seeking compensation under the Takings Clause must "establish that government action caused the injury to their properties," i.e., "that the invasion was the 'direct, natural, or probable result of an authorized activity.'" St. Bernard Par. Gov't v. United States, 887 F.3d 1354, 1359–60 (Fed. Cir. 2018), cert. denied sub nom. St. Bernard Par. v. United States, 139 S. Ct. 796 (2019) (quoting Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003)). Further, "in order to establish causation, a plaintiff must show that in the ordinary course of events, absent government action, [he or she] would not have suffered the injury." St. Bernard Par., 887 F.3d at 1362. Therefore, to assess whether the causation element has been met the Court must determine "'what would have occurred' if the government had not acted." Id. (quoting United States v. Archer, 241 U.S. 119, 132 (1916)).

## IV. The Government's Arguments

The government makes three arguments in support of its motion to dismiss the Plaintiffs' amended complaints under RCFC 12(b)(6): 1) that the Plaintiffs have failed to state a claim because their amended complaints allegedly do not "pinpoint" the precise action that constituted a taking of their properties; 2) that Plaintiffs' takings claims are fatally flawed because their amended complaints do not include allegations that take into consideration the flood reduction benefits provided by components of the Mississippi River & Tributaries Project ("MR&T") of which they claim the ORCS is a part; and 3) that, under the reasoning of Ridge Line and related cases, Plaintiffs' claims sound in tort and are not taking claims at all.

For the reasons set forth below, the Court concludes that each of these contentions lacks merit. Therefore, the government's motion to dismiss under RCFC 12(b)(6) must be denied.

### A. Plaintiffs' Alleged Failure to Pinpoint the Precise Government Action that Gave Rise to Their Takings Claims

As noted, in its motion to dismiss, the government argues that Plaintiffs failed to state a claim for which relief can be granted because the amended complaints do not adequately "pinpoint the precise" government action that led to the taking. Def.'s Mot. at 14 (citing Acceptance Ins. Cos. v. United States, 583 F.3d 849, 855 (Fed. Cir. 2009)). It contends that "[i]nstead of identifying a specific government action at a particular time and place," Plaintiffs allege only "generally" that "'the Corps' design, construction, and subsequent operation of the ORC[S] and other related activities' caused the flooding of their land." Id. (quoting Miss. Am. Comp. ¶ 21). "In other words," the government asserts, the Plaintiffs "allege that every action related to the ORCS has led to a taking." Id. This "failure to pinpoint a specific government action," the government argues, "does not satisfy pleading requirements." Id. (citing Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995)).

The government's objection lacks merit. For one thing, the cases it cites for the proposition that a plaintiff must "pinpoint" the precise action that caused a taking of their properties are inapposite because they are regulatory and not physical takings cases. See Def.'s Mot. at 14 (citing Acceptance Insurance, 583 F.3d at 850; Branch, 69 F.3d at 1573). As the Supreme Court has observed, there is a "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other," which "makes it inappropriate to treat cases involving physical takings as controlling precedents

9

for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." Tahoe-Sierra, 535 U.S. at 323.

Further, and in any event, Plaintiffs' amended complaints have provided more than enough specificity regarding the government actions that they allege resulted in a taking of their properties: the construction and operation of the ORCS. They contend that, over time, the ORCS has "obstructed the natural water and sediment flow of the Mississippi River," and "constrained its ability to carry water without hindrance, which in turn has created a bottleneck, causing waters to back up upstream of the ORC[S], resulting in increased flooding of [Plaintiffs' properties]." Miss. Am. Compl. ¶ 32.

Their amended complaints include allegations that detail the gradual buildup of sediment and the aggradation of the Mississippi River in the immediate vicinity of the inflow channels of the ORCS. Plaintiffs also allege that the accumulation of sediment and its impacts on water levels upstream were foreseeable consequences of the Corps' construction and operation of the ORCS. Plaintiffs further claim that, as a result of the Corps' intervention in the natural flow of the Mississippi River, there was an increase in the frequency, depth, and duration of flooding on Plaintiffs' properties beyond what would have occurred had the ORCS not been constructed and the waters of the Mississippi been allowed to take their natural course into the Achafalaya.

The fact that the Plaintiffs have alleged that the flooding is the product of the combined effect of the design, construction, and operation of the ORCS over a period of time does not—as the government contends—undermine the validity of Plaintiffs' takings claims. To the extent that these can be characterized as separate actions, they were undertaken for a single purpose—to divert the waters of the Mississippi and prevent their capture by the Achafalaya. There is no requirement under these circumstances that Plaintiffs provide greater specificity—particularly at the pleading stage.

The court reached a similar conclusion in Ideker Farms, Inc. v. United States, 136 Fed. Cl. 654, 675 (2018). In that case, the Corps made numerous changes in its operation of the Mainstem Reservoir and Dam System on the Missouri River to bring the river back to a more natural state and into compliance with the Endangered Species Act. Plaintiffs argued that the cumulative impact of the various changes the Corps implemented resulted in increased and more severe flooding of their properties. Id. at 672–73. The government argued that Plaintiffs' takings claims were fatally flawed because they did not "pinpoint" the precise change that constituted the taking. Id. at 673. Citing Arkansas Game and Fish Commission v. United States, 736 F.3d 1364 (Fed. Cir. 2013), the court rejected the government's argument and held that plaintiffs could meet their burden of showing causation by proving that: (1) the changes the Corps made were for a single purpose; (2) the cumulative and combined effects of the changes made for that single purpose led to higher water surface elevations than would have otherwise existed; and (3) the higher water surface elevations led to flooding, or more severe flooding than would have been experienced without the changes. Id. at 674.

The Court finds the reasoning in Ideker Farms persuasive. It therefore rejects the government's argument that Plaintiffs' amended complaints should be dismissed because they fail to "pinpoint" the government action or actions that resulted in the taking of their properties.

### B. Plaintiffs' Obligation to Include Allegations in Their Amended Complaints Regarding the Flood Reduction Benefits Provided by Other Aspects of the Mississippi River and Tributaries Project

The government's second contention is that Plaintiffs' allegations as a whole fail to state a claim for a taking because they "improperly isolate the ORCS, and thereby fail to take account of other Government actions that reduce flood risks." Def.'s Mot. at 16. In particular, the government argues, Plaintiffs' amended complaints do not include allegations that account for the effect of the flood control measures the Corps has implemented along hundreds of miles of the Mississippi River, in accordance with the MR&T.[6] Citing St. Bernard Parish, 887 F.3d at 1363, the government argues that "[t]o state a proper takings claim, Plaintiffs must plead and ultimately prove that the alleged negative effects of the ORCS exceed the overall positive benefits to their property provided by the larger MR&T," which the government contends "encompasses the ORCS." Id.

The government's reliance on St. Bernard Parish is misplaced. In St. Bernard Parish, the plaintiffs alleged that the United States was liable under the Takings Clause for flooding that occurred when levees built by the federal government for flood protection were breached in the wake of Hurricane Katrina. They contended that the government's construction and operation of the Mississippi River-Gulf Outlet ("MRGO") navigation channel "caused various adverse impacts that [ultimately] increased storm surge along the channel." 887 F.3d at 1357. They further alleged that the increased storm surge led to the breach of the levees built along the channel and worsened the flooding on their properties.

The trial court had ruled in favor of the plaintiffs after trial, finding that the Corps' actions (and inactions) regarding the MRGO had substantially increased the storm surge related flooding that occurred during Hurricane Katrina. The court of appeals reversed. It observed that proof of causation "requires a showing of 'what would have occurred' if the government had not acted." Id. at 1362 (quoting United States v. Archer, 241 U.S. 119, 132 (1916)). It held that the plaintiffs did not meet this burden because they did not "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all." Id. at 1363. Specifically, plaintiffs failed to account for the effects of other actions taken by the federal government to protect against hurricane damage, "including the construction of a vast system of levees." Id. Plaintiffs "presented no evidence, and the [trial court] made no findings, as to whether the combination of th[e] MRGO-related effects and the [federal] levees caused flooding on plaintiffs' properties greater than would have occurred had the government engaged in no action at all." Id. at 1359.

The court of appeals concluded, therefore, that plaintiffs had failed to meet their burden of showing causation. "[T]he causation analysis," the court of appeals instructed, "must consider

---

[6] The MR&T was authorized by the Flood Control Act of 1928. Def.'s Mot. at 5. According to the government, the MR&T established a "comprehensive, unified system of public works" that provides "flood risk management," including "floodways, spillways, channel improvements," "bank stabilization measures," and "levees" to the lower Mississippi River valley, all designed "to safely direct floodwaters and protect against a high-water event." Id. at 6.

11

both risk-increasing and risk-decreasing government actions over a period of time to determine whether the totality of the government's actions caused the injury." Id. at 1365. To make this assessment, the court must take into account government actions that are "directed to the same risk that is alleged to have caused the injury to the plaintiffs." Id. Put another way, "[w]hen the government takes actions that are directly related to preventing the same type of injury on the same property where the damage occurred, such action must be taken into account even if the two actions were not the result of the same project." Id. at 1366.

   The Court is skeptical of the government's broad reading of this aspect of the holding in St. Bernard Parish. According to the government, to demonstrate causation, the Plaintiffs must show the extent to which their land would have been flooded if the Corps had neither built and operated the ORCS nor effected any aspect of the MR&T's comprehensive scheme of flood protection for the lower Mississippi River. But in St. Bernard Parish, the court of appeals' focus was narrower. It noted that there was "no question that the [flood control action—i.e., the construction of the levees] was directed to decreasing the very flood risk that the plaintiffs allege was increased by the [Corps navigation project—i.e., the MRGO]." Id. at 1365. As noted, it held that "when the government takes actions that are directly related to preventing the same type of injury on the same property where the damage occurred, such action must be taken into account even if the two actions were not the result of the same project." Id. at 1366 (emphasis added). St. Bernard Parish cannot be read to require Plaintiffs to show what would have occurred on their land had the Corps undertaken no flood protection action at all on the lower Mississippi River.

   In any event, regardless of the nature of the showing that will be required regarding other Corps actions, St. Bernard Parish was before the court of appeals after a trial on the merits. This case is before the Court on a motion to dismiss. The government will have the opportunity during the merits phase to come forward with evidence that the Corps implemented flood-risk-reduction measures that must be taken into consideration under the reasoning of St. Bernard Parish. It will then fall to the Plaintiffs to either persuade the Court that the identified actions are not of the type that St. Bernard Parish requires it to consider or to address the effect of those actions on its proof of causation. But at this stage in the litigation, Plaintiffs are not required to include allegations in their amended complaints that address the effects of unspecified flood-risk-reduction actions undertaken by the Corps. See Quebedeaux v. United States, 112 Fed. Cl. 317, 321–22 (2013) (rejecting the argument that "a party pleading a takings must address every facet of its claim, including likely defenses, in the complaint" and observing that to avoid dismissal "plaintiffs did not need specifically to aver that the harm caused by the flood here exceeded the benefits provided to plaintiffs by [a] flood control project"). Taken as true and with all inferences resolved in their favor, Plaintiffs' allegations that the ORCS's construction and operation caused flooding of a duration and severity that would not have occurred in its absence are sufficient to state a claim for relief.

   **C.  Whether Plaintiffs Allege Torts Rather than Takings**

   The government's final argument is that insofar as Plaintiffs' claims turn on the buildup of sediment in the vicinity of the ORCS, Plaintiffs have alleged a tort, not a taking. Id. at 20. This contention also is unpersuasive.

In Ridge Line, the court of appeals set out a two-part test for distinguishing torts from takings. "First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" Ridge Line, 346 F.3d at 1355 (quoting Columbia Basin Orchard v. United States, 132 Ct. Cl. 445, 450 (1955)). Second, the "invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner[']s right to enjoy his property for an extended period." Id. at 1356.

Plaintiffs' allegations satisfy the first prong of Ridge Line. They assert that the direct result of the construction and operation of the ORCS was the buildup of sediment which narrowed the channel, raised water levels, and resulted in increased flooding of Plaintiffs' upstream properties. The gravamen of their amended complaints is that had the ORCS never been built, their land would not have experienced flooding of the duration and severity now suffered because the Mississippi would have flowed unhindered past their land and into the Gulf of Mexico. This constitutes an allegation that "the asserted invasion" (i.e., increased flooding) is the "direct, natural, or probable result of an authorized activity." Id. at 1355.

As to the second prong, the amended complaints allege that the federal government appropriated a benefit to itself at the Plaintiffs' expense. Specifically, they contend that the Corps built and operated the Structure to forestall the economically catastrophic consequences for the region of allowing the Atchafalaya to capture the Mississippi River. They further allege that the construction and operation of the Structure pre-empted their rights to use their land for significant periods of time, alleging that the flooding is "now inevitably recurring and at higher levels so as to be permanent in nature." See Miss. Am. Compl. ¶ 67. The allegations therefore satisfy Ridge Line's second prong.

In short, taken as true, Plaintiffs' allegations state a claim for a taking, not a tort. Therefore, the government's third basis for dismissal under RCFC 12(b)(6) is denied.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss the claims of the beneficiaries of the Williams Trust pursuant to RCFC 12(b)(1) is **GRANTED**. Therefore, the claims brought by James Kelley Williams, Jr., George Pittman Williams, and Clifford Calhoun Williams, as Plaintiffs in Case No. 19-258, are dismissed without prejudice. The remainder of the government's motion is **DENIED**.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge