# In the United States Court of Federal Claims

|  |  |
|---|---|
| STATE OF MISSISSIPPI, *et al.* )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE UNITED STATES OF AMERICA, )<br>)<br>Defendant. )<br> ) | Consolidated<br>Nos. 19-231L/19-258L/19-1968L/<br>19-1812L/20-30L/21-820L/23-1729L<br><br>(Filed: September 17, 2024) |

John W. ("Don") Barrett, Barrett Law Group, P.A., Lexington, MS, with whom was Patrick W. Pendly, Pendly, Baudin & Coffin, LLP, Plaquemine, Louisiana, for Plaintiffs. Charles J. LaDuca, Mark H. Dubester, and Jennifer E. Kelly, Cuneo Gilbert & Laduca, LLP, Washington, DC; Sterling Aldridge and David McMullan, Jr., Barrett Law Group, P.A., Lexington, MS; Jerry Adballa, Adballa Law, PLLC, Great Falls, VA; Robert J. Cynkar, McSweeney, Cynkar & Kachouroff, PLLC, Great Falls, VA; William F. Blair and Eric Patterson, Blair & Bondurant, P.A., Jackson, MS; Richard Barrett, Law Office of Richard R. Barrett, PLLC, Oxford, MS, and Larry D. Moffett, Law Office of Larry D. Moffett, PLLC, Oxford, MS, Of Counsel.

Brian R. Herman, Senior Trial Attorney, Environmental & Natural Resources Division, U.S. Department of Justice, Washington, DC, with whom were Peter W. Brocker, Daniel Luecke, and Frances B. Morris, Trial Attorneys, and Todd Kim, Assistant Attorney General, for Defendant.

**OPINION AND ORDER**

**KAPLAN, Chief Judge.**

The plaintiffs in these consolidated cases include the State of Mississippi, its Secretary of State and Attorney General (in their representative capacities), several school districts, and hundreds of private entities and individuals who own property located along the Lower Mississippi River. They allege that the federally operated Old River Control Structure ("ORCS"), which is located on the Lower Mississippi River's west bank, has caused "massive amounts of sediment" to accumulate in the ORCS's vicinity. See Williams Am. Compl. ¶ 6, ECF No. 7, Miss. Am. Compl. ¶ 6, ECF No. 8. This buildup of sediment, they claim, has narrowed the river's banks and raised its elevation, "creating extensive sand bars and other obstructions that impede the [r]iver's flow and raise water levels upstream from the ORC[S]—where Plaintiffs' property is located." Williams Am. Compl. ¶ 6; Miss. Am. Compl. ¶ 6. The result, according to Plaintiffs, is that there has been an increase in the "frequency, severity, and duration" of the seasonal flooding that has historically occurred on their properties. Williams Am. Compl. ¶ 6; Miss. Am. Compl. ¶ 6. They seek compensation under the Fifth Amendment's Takings Clause for what they characterize as the government's taking of a permanent flowage easement on their lands. Williams Am. Compl. ¶¶ 8, 86; Miss. Am. Compl. ¶¶ 8, 88.

Due to the number of plaintiffs and properties at issue, the parties jointly identified nine representative bellwether plaintiffs for trial. See Joint Status Report at 1–2, ECF No. 56. With discovery on liability and compensation as to the bellwether plaintiffs' claims now complete, the cases are before the Court on (1) the bellwether Plaintiffs' Motion for Partial Summary Judgment, [hereinafter Pls.' Mot.], ECF No. 184, and (2) the government's Cross-Motion for Summary Judgment, [hereinafter Def.'s Cross-Mot.], ECF No. 194, which is based on, among other things, the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501.

For the reasons set forth below, the Court concludes that Plaintiffs have not provided sufficient evidence to establish that the claims of the bellwether plaintiffs were filed within six years of their accrual, as required by 28 U.S.C. § 2501. Therefore, the claims of the bellwether plaintiffs are dismissed based on lack of subject-matter jurisdiction.

## BACKGROUND

### I. The Flood Control Act of 1928

The Mississippi River originates in the state of Minnesota and increases in strength and volume as it progresses toward the Gulf of Mexico. Def.'s Ex. 1, at 2, ECF No. 194-1. Its watershed makes up about 40 percent of the continental United States—approximately 1,200,000 square miles. Id. "Within this watershed, the Mississippi River meanders southward from Cape Girardeau, M[issouri], through an enormous alluvial flood plain and then passes through its delta into the Gulf of Mexico." Def.'s Ex. 8, at 7, ECF No. 194-8.[1]

"[B]eing alluvial," the Mississippi River "does not excavate and maintain its channel deep enough and wide enough to carry the large floods within its banks." Id. at 8. As a result, lands adjacent to the river have historically been subject to flooding. Id. at 7–8; see also Def.'s Ex. 9, at 12, ECF No. 194-9.

Several of these flood events have been particularly severe. Most notable among these was the Great Flood of 1927, when "[r]elentless rains . . . fueled an overflowing Mississippi River that brought ruin to a stretch of the Mississippi River Valley the size of Massachusetts, Connecticut, New Hampshire, and Vermont." Harrison Cnty. v. U.S. Army Corps of Eng'rs, 63 F.4th 458, 460 (5th Cir. 2023); see also Def.'s Ex. 9, at 13 (describing the death toll and property damage caused by the Great Flood of 1927).

Congress responded to the Great Flood of 1927 by enacting the Flood Control Act of 1928. Harrison Cnty., 63 F.4th at 460 (citing Flood Control Act of 1928, Pub. L. No. 70-391, ch. 569, 45 Stat. 534 (codified at 33 U.S.C. § 702a)). The Act of 1928, in turn, launched the Mississippi River and Tributaries Project (the "MR&T"), "a comprehensive flood control

---

[1] An alluvial plain is "a level or gently sloping flat or a slightly undulating land surface resulting from extensive deposition of alluvial materials by running water." Merriam-Webster's Collegiate Dictionary 58 (11th ed. 2001).

program tasked with averting the worst Mississippi River flood conceivable—the so-called 'project design flood.'" Id.; see also Def.'s Ex. 9, at 24.[2]

## II. The Flood Control Act of 1954

In 1954, Congress authorized the construction of the ORCS as a part of the MR&T. Flood Control Act of 1954, Pub. L. No. 83-780, §§ 201–03, 68 Stat. 1248, 1256–58 (codified as amended at 33 U.S.C. §§ 701-1, 701b-8, 701c, 702a-12). Its purpose was to avert the disastrous economic and other consequences that would ensue were the Atchafalaya River to "capture" the Mississippi, as it appeared it was increasingly likely it would do in the not too distant future. Flood Control Omnibus Bill: Hearing on H.R. 9859 Before the Subcomm. on Flood Control of the H. Comm. on Pub. Works, 83rd Cong. 760 (1954) (statement of Brig. Gen. John R. Hardin, President, Mississippi River Commission, U.S. Army Corps of Engineers).

As the Army Corps of Engineers described in a 1952 report to Congress, for decades "a steadily increasing volume of water ha[d] been diverted from the Mississippi River into the Atchafalaya distributary" at the site of the Old River. Def.'s Ex. 5, at 3, ECF No. 194-5. The report explained that 25 percent of the water of the Mississippi was then being diverted into the Atchafalaya and that "a critical stage" would be reached "at some time before 50 per[cent] of the flow is diverted." Id. at 12. Once this critical stage came to fruition, the Corps warned, "closure of the Mississippi River below Old River will be rapid and diversion will be uncontrollable." Id. The Corps' "conservative maximum estimate as to when the critical stage w[ould] occur" was at the point that 40 percent of the Mississippi was being diverted into the Atchafalaya. Id. The Corps predicted that—absent intervention—this was likely to occur between 1965 and 1975. Id.; see also Def.'s Ex. 8, at 12–14 (1954 report of the Mississippi River Commission predicting that diversion of Lower Mississippi River into the Atchafalaya was expected not only to continue but to accelerate, and that absent intervention the Atchafalaya would "capture" the Mississippi "somewhere between 1968 and 1985, probably around 1975").

The Corps further warned Congress, in no uncertain terms, that the capture of the Mississippi by the Atchafalaya would have devastating economic and environmental consequences. New Orleans, it observed, "is one of the Nation's largest ports, and from Baton Rouge to the Head of Passes . . . vast industrial development has occurred along the banks of the river." Def.'s Ex. 8, at 16. "Should the Mississippi be lost to the Atchafalaya," the Corps explained, "it could be expected that the present channel of the Mississippi River would become filled with sands and silt . . . and eventually no flow, except during floods, would pass down the leveed channel." Id. Barge traffic would have to be rerouted, New Orleans and Baton Rouge would lose access to their freshwater supply, and saltwater intrusion would occur far upstream. Id. at 16–17. Capture would prevent industry from using the Mississippi's water and lead to a "high degree of pollution in the reduced stream [that] would make the water unfit as a source of public water supply and for many other uses." Id. at 22.

---

[2] The MR&T combines levees with outlet channels so that the Mississippi can "flow to the Gulf through the most efficient natural drainage basins." Def.'s Ex. 9, at 23. It also incorporates channel stabilization measures that operate "to keep the channel in one place," as well as bank protection measures that primarily consist of revetments. See id. at 30.

To avert these consequences, the Corps proposed a plan to Congress "for the control of flows from the Mississippi River into the Atchafalaya River and Basin." Id. at 18. Reporting that "[t]he distribution of flow and sediment in the Mississippi and Atchafalaya Rivers is now in desirable proportions," the Corps recommended implementing "[c]ontrol measures which will assure the maintenance of the present water-sediment relationship." Id. at 14. These included the proposed construction of two control structures on the Mississippi's right descending bank, an inflow and outflow channel for one of those structures (i.e., the Low Sill Structure), a navigation lock connecting the Mississippi and Old Rivers, and a dam closing Old River. Id. at 18–19.

On September 3, 1954, Congress adopted the Corps' recommendations and authorized the construction of the ORCS as a modification to the MR&T. See Flood Control Act of 1954 §§ 201–03. The legislation required that the Corp design and operate the ORCS to maintain the then-existing distribution of the flow, so that approximately 70 percent of the combined flow would remain in the Mississippi River, with 30 percent going to the Atchafalaya River. See Def.'s Ex. 16, at 2, ECF No. 194-15.

### III. The Construction and Subsequent Modifications of the ORCS

Consistent with the congressional authorization, construction started on the ORCS in 1955. Def.'s Ex. 11, at 5, ECF No. 194-11. In 1963, the Old River was dammed in its entirety and replaced by a lock system to permit navigation between the Mississippi and the Atchafalaya. Id. The first of the structures that comprise the ORCS—the Low Sill and Overbank Structures—went into operation in 1963. Id.[3]

About ten years later, in 1973, the Low Sill Structure was badly damaged as a result of a major flood. Pls.' Ex. 7, at 1, ECF No. 199-7; Def.'s Ex. 15, at 16, ECF No. 194-14. In response, the Corps added an Auxiliary Structure, which went into operation in 1986. Id. at 10, 16.[4] Its main purpose was to increase the amount of sediment that could be moved from the Mississippi to the Atchafalaya. Pls.' Ex. 5, at 15:25–16:6, ECF No. 199-5 (Pokrefke Dep.).

### IV. The Hydroplant

In the meantime, in the late 1970s, the Corps started working with private developers who were designing a hydroelectric power plant to operate with the Low Sill and Auxiliary Structures. Def.'s Ex. 15, at 2–3, 8–9; see also Pls.' Ex. 7, at 9–10. As a condition of receiving a license from the Federal Energy Regulatory Commission, the plant developers were required to secure Corps approval of the plant's design and operational features. See Pls.' Ex. 7, at 1, 12; Pls.' Ex. 8, 48:10–16, ECF No. 199-8 (Banks Dep.). Among other things, the Corps approved the

---

[3] The Low Sill Structure is a "reinforced concrete control structure with vertical lift steel gates, an inflow channel from the Mississippi River, and an outflow channel to the Red River." Def.'s Ex. 15, at 6, ECF No. 194-14. The Overbank Structure is also a "reinforced concrete control structure," but "with hinged timber gate panels." Id. at 7.

[4] The Auxiliary Structure includes a "reinforced concrete control structure with steel tainter gates, an inflow channel from the Mississippi River, [and] an outlet channel into the Low Sill Outflow Channel." Def.'s Ex. 15, at 5.

plant's location in a "sediment lean" part of the Mississippi River. See Pls.' Ex. 11, at USACE-1240473, ECF No. 199-11. It did so with the knowledge that the addition of the plant would pass less sediment from the Mississippi River to the Atchafalaya River than the components of the ORCS on their own. Id.; Pls.' Ex. 10, at USACE-1242213, ECF No. 199-10.

Construction began on the Sidney A. Murray, Jr., Hydroelectric Station ("Hydroplant") in 1985 and finished in 1990. Def.'s Ex. 15, at 14. It ultimately commenced operations in 1991. Id. Pursuant to an agreement with the Corps, the plant uses some of the diverted Mississippi River's flow to generate electricity for the town of Vidalia, Louisiana. Id. at 3–4, 8.

**V.     The ORCS Today**

The structures that currently comprise the ORCS, along with the Hydroplant, are depicted in the figure below.[5] They are located along the Mississippi River's west bank, between river miles 304 and 316 (as measured from Head of Passes), 50 miles northwest of Baton Rouge, Louisiana, and approximately 35 miles southwest of Natchez, Mississippi. See Def.'s Ex. 15, at 4.



**VI.    Plaintiffs' Claims Regarding the Impact of the ORCS on Their Properties**

The bellwether properties are situated along the Mississippi River and its tributaries, in and around the East Baton Rouge, West Feliciana, and Tensas Parishes in Louisiana and Adams, Claiborne, Jefferson, Warren, and Wilkinson Counties in Mississippi. See Miss. Am. Compl. ¶¶ 10–18; Williams Am. Compl. ¶ 11; Compl. ¶¶ 312, 368, Ard v. United States, No. 19-1968 (Fed. Cl. Dec. 30, 2019), ECF No. 1; Compl. ¶¶ 96, 192, 220, Bancroft Enters., LLC v. United States, No. 20-30 (Fed. Cl. Jan. 10, 2020), ECF No. 1. Virtually all of the properties are located

---

[5] The ORCS and the Hydroplant are often referred to collectively as the Old River Control Complex ("ORCC").

in the "batture" and are routinely subject to seasonal flooding. See Pls.' Mot. at 19. Typically, this type of alluvial land "is uncovered at the time of low water[] but is covered annually at the time of ordinary high water." Gen. Box Co. v. United States, 351 U.S. 159, 160 n.1 (1956) (quoting Boyce Cottonseed Oil Mfg. Co. v. Board of Comm'rs, 107 So. 506, 508 (La. 1925).

As noted above, Plaintiffs allege that the construction and operation of the ORCS has caused what was historically mild seasonal flooding to increase in frequency, severity, and duration, resulting in their properties being inundated for months at a time. Miss. Am. Compl. ¶ 6; Williams Am. Compl. ¶ 6; Compl. ¶ 6, Ard, No. 19-1968 (Fed. Cl. Dec. 30, 2019); Compl. ¶ 6, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020). They allege further that the intensified flooding has interfered and continues to interfere with their use and enjoyment of their properties for activities such as timber harvesting, agricultural production, recreation, and mineral exploration. See Miss. Am. Compl. ¶¶ 10–18; Williams Am. Compl. ¶ 11; Compl. ¶¶ 312, 368, Ard, No. 19-1968 (Fed. Cl. Dec. 30, 2019); Compl. ¶¶ 288–89, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020). Plaintiffs claim that the financial losses and property damage they have suffered amount to a taking for which they are entitled just compensation. See Miss. Am. Compl. ¶¶ 59–72, 93; Williams Am. Compl. ¶¶ 55–70, 91; Compl. ¶¶ 413–27, 448, Ard, No. 19-1968 (Fed. Cl. Dec. 30, 2019); Compl. ¶¶ 281–95, 316, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020).

## VII.   This Action

The State of Mississippi filed its initial complaint on February 11, 2019. See Miss. Compl., ECF No. 1. A few days later, Plaintiff J. Kelley Williams, Sr., filed a similar complaint as trustee for the J. Kelley Williams Revocable Trust UAD 1991, "which owns the Lake Mary Planting Company land in Adams County, Mississippi." Compl. ¶ 7, Williams v. United States, No. 19-258 (Fed. Cl. Feb. 15, 2019). On March, 13, 2019, the Court issued an order consolidating the two cases and naming the action filed by the State of Mississippi, No. 19-231, the lead case. Order, Williams, No. 19-258 (Fed. Cl. Mar. 13, 2019).

On May 9 and 10, 2019, Plaintiffs in the now-consolidated cases filed amended complaints. ECF Nos. 7, 8. A few months later, on July 12, 2019, the government filed a motion to dismiss the two consolidated cases. Def.'s Mot. to Dismiss, ECF No. 9. The Court largely denied that motion on February 6, 2020. Op. & Order, ECF No. 27.

Thereafter, hundreds of other individuals and entities that own land along the Lower Mississippi River filed similar actions in five other cases, which the Court also consolidated with this action. See Am. Compl. ¶¶ 7–30, Bowen v. United States, No. 19-1812 (Fed. Cl. Feb. 28, 2020), ECF No. 14; Compl. ¶¶ 10–372, Ard, No. 19-1968 (Fed. Cl. Dec. 30, 2019), ECF No. 1; Compl. ¶¶ 10–243, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020), ECF No. 7; Compl. ¶¶ 10–147, C3 Energy, LLC v. United States, No. 21-820 (Fed. Cl. Jan. 29, 2021), ECF No. 1; Compl. ¶¶ 10–552, Bland v. United States, No. 23-1729 (Fed. Cl. Oct. 4, 2023).

The parties have jointly identified nine bellwether plaintiffs for the initial trial of the consolidated cases: (1) the Heirs of Andrew Jackson Estate;[6] (2) the Davis Island Land

---

[6] The Heirs of Andrew Jackson Estate land is located near river mile 244 in East Baton Rouge Parish, Louisiana. Compl. ¶ 312, Ard, No. 19-1968 (Fed. Cl. Dec. 30, 2019).

Company;[7] (3) Geronimo Hardwood Timber, LLC and Robert W. Manning, III;[8] (4) State of Mississippi/Adams County School District; (5) State of Mississippi/Claiborne County School District; (6) State of Mississippi/Wilkinson County School District;[9] (7) Oakwood Plantation;[10] (8) Dorothy Wallace Woodside, George J. Woodside, III, Henry Wallace Woodside, and Chaille Marie Mount ("Woodside Plaintiffs");[11] and (9) J. Kelley Williams, Sr., and the James Kelley Williams Revocable Trust UAD 1991 ("Williams Plaintiffs").[12] Joint Status Report at 1–2, ECF No. 56.

Discovery is complete for the bellwether plaintiffs as to both liability and compensation. On October 10, 2023, Plaintiffs filed a motion for partial summary judgment. See Pls.' Mot. The government filed its cross-motion for summary judgment on December 15, 2023. See Def.'s Cross-Mot. In that cross-motion the government contends, among other things, that this Court lacks subject-matter jurisdiction over Plaintiffs' claims because they accrued more than six years before Plaintiffs filed suit. Id. at 17.

The parties' cross-motions were fully briefed as of February 21, 2024. See Pls.' Resp. & Reply to Def.'s Cross-Mot., ECF No. 199 [hereinafter Pls.' Resp.]; Def.'s Reply to Pls.' Resp., ECF No. 209 [hereinafter Def.'s Reply]. On July 11, 2024, the Court held oral argument limited to the government's motion for summary judgment based on lack of subject-matter jurisdiction. Oral Arg. Tr., ECF No. 213.

## DISCUSSION

### I. The Government's Motion

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers jurisdiction on the Court of Federal Claims to hear suits for compensation under the Takings Clause. See, e.g., Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (citing Preseault v. Interstate Com. Comm'n, 494 U.S. 1, 11–12 (1990)). Such suits, however, must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501. This six-year limitations period "is a jurisdictional requirement

---

[7] The Davis Island Land Company, LLC, land is located near river mile 418 in Warren County, Louisiana. Compl. ¶ 96, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020).

[8] The Geronimo Hardwood Timber, LLC, and Robert W. Manning, III, land is located near river miles 394 and 381 and elsewhere in Tensas Parish, Louisiana. Compl. ¶¶ 192, 220, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020).

[9] The school trust lands in Adams, Claiborne, and Wilkinson Counties are located approximately six to 106 miles upriver from the ORCS. See Miss. Am. Compl. ¶¶ 10–17.

[10] The Oakwood Plantation land is located near river mile 384 in Tensas Parish, Louisiana. Compl. ¶ 212, Bancroft, No. 20-30 (Fed. Cl. Jan. 10, 2020).

[11] The Woodside Plaintiffs' land is located near river mile 266 in West Feliciana Parish, Louisiana. Compl. ¶ 368, Ard, No. 19-1968 (Fed. Cl. Dec. 30, 2019).

[12] The Williams Plaintiffs' land is located about 20 miles upstream of the ORCS. Williams Am. Compl. ¶ 11.

attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988). The burden is on the plaintiff to show by preponderant evidence that his or her claims were filed within the statutory limitations period. See Ideker Farms, Inc. v. United States, 71 F.4th 964, 975 (Fed. Cir. 2023); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

The government requests that the Court enter summary judgment on its behalf on the grounds that the bellwether plaintiffs have failed to show that their claims accrued within the six-year limitations period. "In general," however, "courts have ruled that summary judgment is an inappropriate vehicle for raising a question concerning the court's subject-matter jurisdiction." 10A Charles Alan Wright et al., Federal Practice & Procedure § 2713. That is because "[i]f the court has no jurisdiction, it has no power to enter a judgment on the merits and must dismiss the action." Id. "The court's role on the two motions also is different. On a motion attacking the court's jurisdiction, the [trial judge] may resolve disputed jurisdictional-fact issues." Id. (citations omitted). But "[o]n a motion under R[CFC] 56[,] the judge must determine whether any issues of material fact exist that require trial." Id. For these reasons, the Court will treat the government's motion for summary judgment based on the statute of limitations as a motion to dismiss under RCFC 12(b)(1). See Kirkham v. Societe Air France, 429 F.3d 288, 291 (D.C. Cir. 2005).

As a general matter, when determining the existence of subject matter jurisdiction, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). However, where the government challenges a plaintiff's allegations of jurisdiction in a motion to dismiss under RCFC 12(b)(1), only those factual allegations that the government does not controvert are accepted as true. Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012) Where jurisdictional facts are controverted, the Court "may consider relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see also Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991) (finding that a court may "inquire into jurisdictional facts" in ruling on a motion to dismiss under RCFC 12(b)(1)).

The Court has conducted an inquiry into the jurisdictional facts based on the exhibits, deposition transcripts, discovery responses, and other documents the parties submitted in connection with the cross-motions for summary judgment. For the reasons set forth below, it finds that the bellwether plaintiffs have not established that their takings claims were filed within the limitations period. Those claims must therefore be dismissed, as they are outside the Court's subject-matter jurisdiction.

## II.   Claim Accrual and the Stabilization Doctrine

The earliest (and lead) case in these actions, Mississippi v. United States, was filed on February 11, 2019. See Miss. Compl. Therefore, to invoke this court's jurisdiction under the Tucker Act, the school district bellwether plaintiffs must show that their claims accrued no earlier than February 11, 2013. See 28 U.S.C. § 2501; see also Goodrich v. United States, 434

F.3d 1329, 1333 (Fed. Cir. 2006). Similarly, the other bellwether plaintiffs must demonstrate that their claims accrued no earlier than six years before they filed suit.

As a general rule, a takings claim accrues "when all the events have occurred which fix the liability of the Government," and "the plaintiff knew or should have known of the existence of the events fixing the government's liability." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1355–56 (Fed. Cir. 2006) (first quoting Goodrich, 434 F.3d at 1333; then citing Goodrich, 434 F.3d at 1333; Hopland Band of Pomo Indians, 855 F.2d at 1577; Kinsey v. United States, 852 F.2d 556, 557 n.* (Fed. Cir. 1988)), aff'd, 552 U.S. 130 (2008); see also Ideker Farms, 71 F.4th at 975.

In cases where a discrete governmental action effects a taking, determining the date of accrual is relatively straightforward. On the other hand, when property is "taken by a gradual physical process rather than a discrete action," it can be difficult to ascertain the precise moment when all the events giving rise to liability have occurred. See Ideker Farms, 71 F.4th at 975 (quoting Mildenberger v. United States, 643 F.3d 938, 945 (Fed. Cir. 2011)). To account for this difficulty, courts apply the "stabilization doctrine," under which a takings claim accrues "when it 'becomes clear that the gradual process set into motion by the [G]overnment has effected a permanent taking.'" Banks v. United States, 741 F.3d 1268, 1281 (Fed. Cir. 2014) (alteration in original) (quoting Boling, 220 F.3d at 1370–71); see also Seldovia Native Ass'n v. United States, 144 F.3d 769, 774 (Fed. Cir. 1998).

Plaintiffs' claims in this case are subject to the stabilization doctrine. They contend that when the government began operating the ORCS in 1963, it set into motion a process that caused sediment to gradually accumulate near the ORCS. Williams Am. Compl. ¶ 26; Miss. Am. Compl. ¶ 33. They further contend that the installation of the Auxiliary Structure in 1986 contributed to this process. See Pls.' Resp. at 6–7. As noted above, they assert that the accumulation of sediment, in turn, has narrowed the Mississippi's banks and raised its elevation, creating sandbars "and other obstructions that impede the River's flow and raise water levels upstream" in the vicinity of the bellwether properties. Williams Am. Compl. ¶ 6; Miss. Am. Compl. ¶ 6. As a result, according to Plaintiffs, floods that historically had occurred on only an occasional and seasonal basis began to occur more frequently, last longer, and become more severe. Williams Am. Compl. ¶ 6; Miss. Am. Compl. ¶ 6. They claim that this constituted a taking of a permanent flowage easement on their land. Williams Am. Compl. ¶ 86; Miss. Am. Compl. ¶ 88.[13]

---

[13] Plaintiffs contend, and the Court agrees, that, "[i]n the case of a federal government project that is modified over time, the stabilization doctrine requires consideration of the pattern of increased inundation caused by the completed project." Pls.' Resp. at 4 (citing Ideker Farms, 71 F.4th at 976). It disagrees, however, with their argument that the federal project here, i.e., the ORCS, was not completed until 1990 when the Hydroplant came online. Id. at 4–5. The Hydroplant is not part of the ORCS; it is privately owned and operated. See Regional Rail Reorganization Cases, 419 U.S. 102, 127 n.16 (1974) (observing that the United States is not liable for "[t]he taking of private property" unless it is carried out "by an officer of the United States . . . authorized, expressly or by necessary implication, to do so by some act of Congress"

Under the stabilization doctrine, Plaintiffs' claims alleging the taking of a permanent flowage easement accrued when it first became evident, through the passage of time, that the more frequent and severe pattern of flooding that they contend the ORCS caused had become a recurrent and permanent one. See Mildenberger, 643 F.3d at 945 (citing United States v. Dickinson, 331 U.S. 745, 749 (1947)) (A cause of action for taking of a permanent easement by flooding did not "accrue[] immediately upon the first inundation of the property because at that point, the frequency and permanency of the flooding were still undeterminable."); Goodrich, 434 F.3d at 1336 ("[T]he 'obligation to sue' arises once the 'permanent nature' of the government action is evident." (quoting Fallini v. United States, 56 F.3d 1378, 1382 (Fed. Cir. 1995))); Barnes v. United States, 538 F.2d 865, 873 (Ct. Cl. 1976) ("[T]he date the Government completed taking its flowage easement cannot be prior to when, through passage of time, the permanent character of intermittent flooding could fairly be perceived."); Boling, 220 F.3d at 1372 ("[T]he touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable.").

For the reasons set forth below, the permanent nature of the alleged taking was evident—and thus, the six-year limitations period began to run—well before February 2013. As a result, the timeframe for filing suit under the Tucker Act, 28 U.S.C. § 2501, had already expired by the time Plaintiffs filed the lead case in February 2019.

### III. Whether It Was Evident Before February 2013 that the Government Had Taken a Permanent Flowage Easement

As described above, the ORCS first went into operation in 1963, was completed in 1986 with the addition of the Auxiliary Structure, and has since been operated to maintain the same 70/30 split in flow that Congress authorized in the mid-1950s. The record is replete with evidence that flooding patterns affecting the bellwether properties not only permanently changed for the worse following the installation of the ORCS in 1963 and its completion in 1986 but also that this worsened flooding was evident as early as the 1970s and certainly no later than the first decade of the 2000s. To the extent that Plaintiffs are correct that it was the ORCS that caused the once seasonal flooding of the bellwether properties to last longer, occur more frequently, and be more severe, a permanent easement was taken long before February 2013.

The Court begins with the opinions of several of Plaintiffs' own experts, each of whom expressed the view that flooding patterns in the Lower Mississippi River batture changed for the worse well before 2013. One of them, Dr. Jonathan Remo, concluded that there was a "significant change in stage for the same discharge" in the reach of the river from Arkansas City to Natchez between about 1970 and the 1990s. Def.'s Ex. 38, at 34:13–22, ECF No. 195-18 (Remo Dep.). Another, Dr. Jeffrey Nittrouer, opined that, beginning about 1990, the total amount of time the Mississippi River was above flood stage, measured by the gauges at Natchez,

---

(quoting Hooe v. United States, 218 U.S. 322, 336 (1910))). In any event, even if the Court were to consider the pattern of flooding that occurred after the Hydroplant came online in 1990, as opposed to changes that occurred after the ORCS was completed in 1986, the outcome in this case would be the same.

Vicksburg, and Greenville, had become months, and not weeks as had typically been the case from 1943 to1973. Def.'s Ex. 37, at 9, ECF No. 195-17; see also Def.'s Ex. 36, at 1, ECF No. 195-16 (August 2016 statement of Plaintiff and then-Mississippi Secretary of State Delbert Hosemann; noting that "the frequency of flooding has evolved from slight to severe springtime flooding in the 1980s to almost yearly moderate to severe flooding occurring from the early 1990s until today").

A third Plaintiffs' expert, Dr. Samuel Muñoz, expressed the opinion that flooding patterns began to change even earlier than the 1990s. He submitted a report that "identifie[d] the trends in peak river stage, high-water duration, and discharge over the water years 1941 [to] 2020" and "evaluate[d] how the relationships between these measurements and annual precipitation have changed over time." Def.'s Ex. 31, at 2, ECF No. 195-11.[14] He also performed a "change-point analysis" using stream gauge measurements from the Mississippi River at Natchez and Vicksburg "to determine whether there was a particular point in time [after the ORCS went into operation in 1963] when peak river stage and high-water duration changed." Id. Based on his analysis, Dr. Muñoz concluded that water year 1973 was the year that both "separat[ed] the largest change in peak stages" and marked a large and permanent change in high-water duration. See id. at 3. He further concluded that the changes were not attributable to additional precipitation. Id. at 4 (observing that "the relationships between peak stages, high-water duration, and precipitation [at Natchez and Vicksburg] shifted before and after 1972/1973, such that floods since 1973 are higher and last longer for a given amount of precipitation").

The Corps' historical records are consistent with Plaintiffs' experts' conclusions. They reflect that "[t]he 1973 flood was the first major flood event to occur on the Mississippi River with the [ORCS] in operation." Def.'s Ex. 28, at 2, ECF No. 195-8. They also reflect that after 1973, major flood events occurred with increasing frequency. In the Corps' 1979 post-flood report, it wrote that annual spring flooding did not flood the highest alluvial lands, but that in 1973, 1974, 1975, and 1979, the peak stages inundated the entire batture. Def.'s Ex. 29, at 2, ECF No. 195-9; see also Def.'s Ex. 30, at 2–3, ECF No. 195-10.

Dr. Muñoz's conclusion that patterns of flooding became more severe after 1973 is also consistent with the pre-litigation observations of bellwether Plaintiff J. Kelley Williams, Sr. In a 2016 memorandum, Mr. Williams observed that, with respect to water elevation, "[t]he median lows and highs have increased steadily since 1972. So have the frequency and severity of floods." Def.'s Ex. 23, at 1, ECF No. 195-3; see also Def.'s Ex. 24, at 1, ECF No. 195-4 (explaining in a May 2017 email that the "river has been steadily rising since about 1972"). In later correspondence, Mr. Williams similarly pointed to 1973 as the year when river levels began rising. See Def.'s Ex. 25, at 2, ECF No. 195-5.

The record also includes responses to interrogatories by several of the bellwether plaintiffs that reflect their perceptions that the pattern of flooding on their property changed well before February 2013. The Woodside Plaintiffs, in fact, stated that they "began to notice

---

[14] A "water year" begins on October 1 and ends on September 30. See Def.'s Ex. 31, at 2 n.4. For example, the water year 1973 began on October 1, 1972, and ended on September 30, 1973. See id.

11

additional flooding well in excess of ordinary seasonal flooding of the property by the Mississippi River" beginning in the early 1990s. Def.'s Ex. 40, at 1, ECF No. 195-19 (Woodside Pls.' Suppl. Resps. to Def.'s 2d Set of Interrogs.). Likewise, bellwether Plaintiff Davis Island Land Company stated that its members "began to notice additional flooding well in excess of ordinary seasonal flooding" beginning in 2008, and that "[s]ince then, the property has started to flood earlier and the flooding has lasted longer than in years prior." Def.'s Ex. 41, at 1, ECF No. 196-1 (Pl. Davis Island Land Co.'s Suppl. Resps. to Def.'s 2d Set of Interrogs.).

To be sure, several other bellwether plaintiffs provided responses to the government's interrogatories reflecting that they first noticed a change in the severity of the flooding of their property in 2011. See Def.'s Ex. 42, at 1, ECF No. 196-2 (Pls. Robert W. Manning, III, and Geronimo Hardwood Timber, LLC's Resps. to Def.'s 2d Set of Interrogs.) (stating that Mr. Manning "began to notice additional flooding well in excess of ordinary seasonal flooding of the property by the Mississippi River" in 2011 and that since then "the property has started to flood earlier and the flooding has lasted longer than in [prior] years"); Def.'s Ex. 43, at 1, ECF No. 196-3 (Pl. State of Miss.'s Suppl. Resps. to Def.'s 2d Set of Interrogs.) (stating that "[s]ince 2011, the [16th Section] property has started to flood earlier, and the flooding has lasted longer than in years prior to 2011"); Def.'s Ex. 44, at 1, ECF No. 196-4 (Pl. Oakwood Plantation's Suppl. Resps. to Def.'s 2d Set of Interrogs.) (same); Def.'s Ex. 45, at 1–2, ECF No. 196-5 (Pl. Heirs of the Andrew Jackson Estate Corrected Resps. to Def.'s 2d Set of Interrogs.) (stating that "beginning in 2011, its members began to notice additional flooding well in excess of ordinary seasonal flooding of the property by the Mississippi River").

Of course, in 2011, the area suffered what the Corps called "the largest Mississippi River flood in recorded history." Def.'s Ex. 12, at 2, ECF No. 194-12. It is therefore not surprising that several Plaintiffs have fixed 2011 as the point in time that flooding patterns became more severe. But the subjective and varying recollections of these bellwether plaintiffs collide with the gauge data, which is necessarily more objective and reliable than Plaintiffs' memories. Indeed, Plaintiffs themselves acknowledge as much and rely on the gauge data. See, e.g., Def.'s Ex. 40, at 2 (Woodside Pls.' Suppl. Resps. to Def.'s 2d Set of Interrogs.) (observing that "[w]hile Plaintiff has personally observed the flooding and damage therefrom, the exact dates of when the property started to flood in a particular year are best known by the river gauges that measure the rise of the Mississippi River"); see also Williams Am. Compl. ¶¶ 42–48 (citing gauge data to support the alleged increased rate of flooding on Plaintiffs' property); Miss. Am. Compl. ¶¶ 49–55 (same).

For example, at his October 2021 deposition, Mr. Williams testified that "unprecedented" flooding began in December 2015 and was followed by "the highest January flood ever," which lasted until the following June. See Pls.' Resp. at 15; Pls.' Ex. 41, at 145:6–16, ECF No. 201-1 (K. Williams, Sr., Dep. II). According to the gauge data from 2016, the Mississippi River at Natchez was above the flood stage, i.e., 48 feet, for a total of 51 days, and the peak water surface elevation was 56.7 feet. Def.'s Ex. 48, at 3–9, ECF No. 196-8. Such conditions, however, were hardly "unprecedented," as Mr. Williams characterized them. To the contrary, the river had been at or above flood stage at Natchez for a similar or even greater amount of time in 1991 (45 days), 1993 (46 days), 1994 (75 days), 1997 (43 days), 2008 (65 days), 2011 (70 days), and 2015 (67 days). See generally Def.'s Ex. 49, ECF No. 196-9.

The Natchez gauge data also reflects that the flooding occurred or lasted later into the year than it did in 2016 in 1991, 1993–1998, 2002, 2003, 2008–2011, 2013, and 2015. See generally id. In fact, in 2015, the floods did not end until August. Id. at 222. And, as compared to 2016, the flooding not only lasted a full two weeks longer in 2008 and almost three weeks longer in 2011, but the peak water surface elevation for both years was also higher. Compare id. at 154–63, 181–90 (reflecting 65 days of flooding and a peak water surface elevation of 56.94 feet in 2008 and 70 days of flooding and a peak water surface elevation of 61.83 feet in 2011) with Def.'s Ex. 48, at 3–9 (reflecting 51 days of flooding and a peak water surface elevation of 56.7 feet in 2016).

The Vicksburg gauge data similarly reflects a pattern of excessive flooding beginning well before February 2013. At that gauge, the flood stage is 43 feet. Def.'s Ex. 50, at 1, ECF No. 196-10. In 2016, the river was above flood stage for 30 days, id. at 3–5, with peak elevation at 50.23 feet, id. at 3.[15] Such conditions, however, only occurred in January and March that year. Id. at 3–5. By contrast, flooding at Vicksburg lasted 25 days or more in 1994 (27 days), 1995 (25 days), 1997 (35 days), 2008 (43 days), 2009 (25 days), 2011 (50 days), and 2015 (30 days). See generally Def.'s Ex. 51, ECF No. 196-11. Likewise, it occurred later or lasted later into the year in 1993 (May), 1994 (May), 1995 (June), 1996 (June), 1997 (April), 1998 (May), 2002 (June), 2008 (May), 2009 (June), 2011 (June), 2013 (May), and 2015 (August). See generally id. And the peak water surface elevation exceeded the 2016 level in 2008 (50.95 feet) and 2011 (56.96 feet). See id. at 157, 184.

In short, the objective gauge data shows that flooding of similar or even greater intensity than that which occurred in 2011 and 2016 has been reoccurring since at least the 1990s. To be sure, Mr. Williams testified that the flooding that occurred on his property in 2016 caused greater damage than previous floods, and the Court accepts that his observations were accurate for purposes of summary judgment. See Pls.' Ex. 41, at 146:15–19, 148:11–18 (explaining the floods in 2016 left "pervasive" sand deposits on his property, prompting he and his son to conclude that "[s]omething's changed"). But the "change" Mr. Williams identified was the character and severity of the damage that the flooding that occurred that year inflicted on Mr. Williams' land. And "[t]he obligation to sue arises once the permanent nature of the Government action is evident, regardless of whether damages are complete and fully calculable." Mildenberger, 643 F.3d at 946.

Finally, Plaintiffs cite language that appeared on occasion in certain internal documents prepared by employees of the Corps' New Orleans District beginning in 2000 and continuing through 2015. Pls.' Resp. at 10–14.[16] The cited documents (many of which are drafts) contained

---

[15] As the government points out, there were days for which no specific stage was recorded in the publicly available stage data repository, RiverGages.com. Def's Mot. at 34 n.19. Some of those days came between the days that the river was above flood stage. The Court is not counting those days in its examination of the stage data.

[16] The documents Plaintiffs cite include: (1) February 2000 draft "Sediment and Old River" fact sheet, see Pls.' Ex. 21, ECF No. 199-21; (2) March 2000 briefing outline, see Pls.' Ex. 10; (3) March 2000 draft press release, see Pls.' Ex. 22, ECF No. 199-22; (4) August 2001 "Old River

language stating that continued ORCS-induced buildup of sediment would result in increased water levels and might require raising the levees. According to Plaintiffs, the documents "constitute powerful admissions, not only of the Corps' actual knowledge of the ORCC's direct causal relationship to increased flooding, but of the Corps' actual knowledge that the pattern of increased flooding had not, as yet, stabilized." Id. at 10.

This argument is unpersuasive. Even were the Court to treat the drafts and similarly informal documents as expressing the Corps' official views, they are not helpful to Plaintiffs. The fact that as early as 2000 the Corps was forecasting higher water levels in the future has little bearing, if any, on whether flood patterns had already changed permanently by the 1990s, as Plaintiffs' own experts testified and the gauge data show. Indeed, at least one of the documents cited stated a concern that further sediment buildup would cause water levels to get "even higher." Pls.' Ex. 22, at USACE-1107122, ECF No. 199-22.

The objective evidence, particularly the gauge data, shows that it was evident by some time in the 1990s that the pattern of flooding along the Lower Mississippi had permanently changed and that therefore a permanent flowage easement had been taken. The Court, therefore, turns to the question whether—under Plaintiffs' theory of causation—the accrual date for their claims should nonetheless be suspended because they neither knew nor should have known before February 2013 that it was the ORCS that was responsible for the increased frequency, duration, and severity of flooding on their properties.

### IV. Plaintiffs' Contention That They Neither Knew nor Should Have Known Before February 2013 That Government Action Was Responsible for the Increased Frequency, Duration, and Severity of the Flooding on Their Land

Plaintiffs contend that—even if the permanent nature of the increasingly severe flooding of the bellwether properties was evident more than six years before they filed this lawsuit—the claims of the State of Mississippi and the Williams Plaintiffs did not accrue until April 2018 "at the earliest," while the claims of the other bellwether plaintiffs accrued in February 2019. See Pls.' Resp. at 1–2, 6 (emphasis omitted). Until then, they argue, they did not and could not have known that it was government action (i.e., the operation of the ORCS) that had caused the recurrent atypical flooding of their properties. See id.; see also B.W. Parkway Assocs. Ltd. P'ship v. United States, 29 Fed. Cl. 669, 676 (1993) ("If an injury is clear but its source

---

Control Structure – Significant Events" memorandum, see Pls.' Ex. 23, ECF No. 199-23; (5) August 2003 draft questions and answers on plan to require Hydroplant to dredge sediment, see Pls.' Ex. 24, ECF No. 199-24; (6) February 2004 draft statement of work for the Red, Old River, Mississippi, and Atchafalaya River Sediment and Water Control Study, see Pls.' Ex. 25, ECF No. 199-25; (7) December 2010 "Report on the 76th Meeting of the [Corps] Committee on Channel Stabilization," see Pls.' Ex. 29, ECF No. 199-29; (8) several PowerPoint slides included in "numerous briefings" from March 2013 through December 2015, see Pls.' Resp. at 12; see also Pls.' Ex. 30, ECF No. 199-30; Pls.' Ex. 32, ECF No. 199-32; Pls.' Ex. 37, ECF No. 200-2; Pls.' Ex. 39, ECF No. 200-4; and (9) February 2015 drafts of "Old River Control Complex Sedimentation: Issues, Courses of Action, and Next Steps," see Pls.' Ex. 34, ECF No. 199-34; Pls.' Ex. 35, ECF No. 199-35; Pls.' Ex. 36, ECF No. 200-1.

unknown, the six-year period starts when the plaintiff has reason to know the cause of the injury." (citing L.E. Cooke Corp. v. United States, 27 Fed. Cl. 753, 754 (1993); M.R.K. Corp. v. United States, 15 Cl. Ct. 538, 544–45 (1988))).

The record does not support Plaintiffs' argument. As noted above, a claim does not accrue for purposes of the statute of limitations until a plaintiff "knew or should have known of the existence of the events fixing the government's liability." John R. Sand & Gravel Co., 457 F.3d at 1356. This principle, as the Federal Circuit has observed, is an articulation of the accrual suspension rule. Ingrum v. United States, 560 F.3d 1311, 1315 n.1 (Fed. Cir. 2009). That rule may be invoked where, for instance, a plaintiff's injury is "incapable of detection by the wronged party through the exercise of reasonable diligence." Gonzalez v. United States, 284 F.3d 281, 289 (1st Cir. 2002) (quoting Geo. Knight & Co. v. Watson Wyatt & Co., 170 F.3d 210, 213 (1st Cir. 1999)); see also Cent. Pines Land Co. v. United States, 61 Fed. Cl. 527, 534 (2004).

Accrual will not be suspended, however, "where a claimant could have asserted a claim if it had sought advice, launched an inquiry, or otherwise taken steps to discover available information." Cent. Pines, 61 Fed. Cl. at 534 (citing Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1571 (Fed. Cir. 1993); Menominee Tribe of Indians v. United States, 726 F.2d 718, 721 (Fed. Cir. 1984)). Moreover, in determining what a plaintiff knew or should have known, the court focuses on the plaintiff's "access to the facts" that give rise to his claim, and not on his "actual knowledge" of those facts. Id.; accord Jackson-Greenly Farm, Inc. v. United States, 857 F. App'x 1021, 1028 (Fed. Cir. 2021) (observing in a parenthetical that plaintiffs are "'charged with knowing any facts that are discoverable in public records,'" including "'data, articles, and reports' relating to [their] claims" that are "publicly available" (quoting Yankton Cnty. v. United States, 135 Fed. Cl. 620, 630 (2017), aff'd, 753 F. App'x 905 (Fed. Cir. 2019))); Mobley Constr. Co. v. United States, 68 Fed. Cl. 434, 440 (2005).

The evidence before the Court shows that—had Plaintiffs exercised reasonable diligence—they would have become aware before February 2013 of the alleged relationship between the ORCS, the accumulation of sediment, and the increasingly severe flooding in the batture. Indeed, it is undisputed that as early as the mid-1950s when the ORCS was being planned, members of the scientific community were expressing concerns about whether the ORCS would divert enough sediment from the Mississippi River to the Atchafalaya, or whether instead the sediment would build up in the Mississippi and cause additional flooding. Moreover, the record also shows that had Plaintiffs sought the opinion of an outside consultant when their properties began to experience recurrent more severe flooding, they would almost certainly have become aware of the theory that they are pursuing in this case.

As Plaintiffs' expert Dr. Nittrouer noted in his report, it was "recognized" as a "scientific fact[]" since at least 1952 that "to prevent extensive deposition in the primary channel and preserve the ability of the channel to pass water unimpeded, it is necessary to shunt a substantially larger proportion of upstream moving sediment as compared to water." Def.'s Ex. 37, at 3. "[F]or the ORCC," he observed, "this mean[t] that it was necessary to allow for the passage of a higher percentage of sediment than water (i.e., the sediment-to-water ratio) into the Atchafalaya River to prevent sediment deposition in the Mississippi River channel." Id. "Alternatively," he explained, "if the sediment-to-water ratio diverted at the ORCC is below or even near parity, an imbalance arises and the channel possesses excess sediment that is not

transported." Id. Thereafter, "[t]he material that cannot be transported accumulates on the channel bed, changing its shape (morphology), which in turn affects water flow, including river stages." Id.

That these scientific facts have been understood for decades is also reflected in the minutes from conferences that the Mississippi River Commission held with expert consultants in the 1950s, as it discussed options for preventing the capture of the Mississippi by the Atchafalaya. Def.'s Ex. 19, at 2–4, ECF No. 194-18. For example, in response to the Corps' query whether it would be possible "to control aggradation and degradation in the Mississippi River," one of the consultants explained:

> [I]f you take more sediment proportionate to the amount of water, corresponding to what there is now, there would be some degrading. One of the things you're saying is that you want to take out a large amount of coarse material – bed load material, in order to reduce degradation in the Atchafalaya. And when we do that, when we take out more than we are currently taking out, including the silts and clays, of course degradation takes place in the Mississippi. Now, if we take out more water and less sediment, we'll be in the direction of aggradation.

Id. at 5; see also id. at 6 (another consultant observing that "[i]f sufficient sediment is not taken out, deposition will take place").

The matter was also the subject of a paper entitled "Sediment Diversions Through Distributary Channels Normal to a Major River," which an engineer with the Corps' New Orleans District presented at the Federal Inter-Agency Sedimentation Conference in 1963. See Def.'s Ex. 21, at 1–2, ECF No. 195-1. This paper discussed the upcoming closure of the Old River, the installation of a navigation lock and diversion structure as part of the ORCS, and the potential for aggradation in the Mississippi River if the transmission of sediment between the river and the diversion channel were inefficient. Id. at 2–4; see also id. at 3 (observing that, on the one hand, "[i]f the entrained load matches the transport capacity of the diversion channel, no material will be removed from or deposited on the bed of the diversion channel," but that, on the other, "if the transport capacity of the diversion channel is significantly different, scour or deposit will occur").

The Court agrees with Plaintiffs that neither the notes of the consultant conferences, nor the paper presented at the inter-agency conference would have been readily available to them before this litigation. See Pls.' Resp. at 25–27. But what these documents show is that—at least in the scientific community and within the Corps—it was well-understood for decades that the ORCS would affect sediment transport capacity between the Mississippi River and the diversion channel, and that—depending on its design and operation—there was a risk of causing aggradation in the Mississippi. Had Plaintiffs made inquiry with an expert in the matter, they would have discovered this risk.

Furthermore, there were other more readily available sources of information in the years that followed that discussed sediment buildup around the ORCS and suggested that it was causing water levels on the Mississippi to rise. For example, in May 1977, more than 40 years before Plaintiffs filed suit, an article appeared in the New Orleans Times-Picayune, entitled

16

"River Wants New Path to Gulf." Def.'s Ex. 26, at 1, ECF No. 195-6. This article observed that the "pressure" on the ORCS had "grown steadily" over time. Id. at 2. It cited the observations of an employee at the ORCS who described how, 12 to 15 years earlier, he "could take a boat from the diversion channel through the flood gates and into the Mississippi," but that "[n]ow [it wa]s impossible." Id. "The reason is," the article explained, "that the Mississippi, as geologically predictable, is shoaling up below the structure and the river has to rise to get over the dam it is building." Id. "So," the article continued, "the water level on the Mississippi side of the structure is rising." Id.

Two years later, in 1979, the Corps published an environmental assessment for the planned Auxiliary Structure that also discussed the effect of sediment buildup in the vicinity of the ORCS. See Def.'s Ex. 32, ECF No. 195-12. Under the caption "Background and Need for Action," the assessment included a subsection entitled "Increase Sediment Diversion Capability." Id. at 3. It stated:

> Construction of an auxiliary structure and dual operation with the [L]ow [S]ill [S]tructure would increase the capability for total sediment diversion and for regulation of the amount of sediments diverted. This implies an enhanced ability to maintain stable flow regimes in both the Mississippi and Atchafalaya Rivers. The inflow channel to the auxiliary structure is designed with an [alignment] relative to the Mississippi River similar to that of the natural Old River, to increase the amount of bed-load sediment per unit discharge.

Id.; see also id. at 4 (observing that "[a]n increase in sediment diversion" would decrease the "bedload continuing down the Mississippi River," which "would reduce aggradation and, in conjunction with the control of flow distribution, would reverse the trend of increasing headwater stages at the [L]ow [S]ill [S]tructure").

Concerns about sediment diversion were also discussed in a 1991 New York Times article entitled "Corps of Engineers Struggles to Alter Mississippi's Fate." See Pls.' Ex. 84, at 2, ECF No. 206-4. The article reported that scientists and engineers who studied the Mississippi and Atchafalaya Rivers had come to realize that "they cannot prevail by concentrating on water alone" because "[t]he soil carried by the muddy river, especially the waves of bedload sediment that creep silently along the river bottom, is emerging as a crucial factor." Id. at 3. The article observed that much of the ORCS was "built to govern water, not sediment" and that "[s]ome of its actions even make the sediment situation worse." Id. The article reported on the flow in the Mississippi the previous day, observing that "[t]here was one alarming note," namely that "though the river was carrying only about two-thirds as much water as in 1973, when flood waters rose to 61 feet above sea level, its level hit 55.8 feet yesterday." Id. at 7. "The reason," the New York Times wrote, "is sediment." Id. "Since 1973, the river bottom has silted up, squeezing capacity. Flows that were nothing remarkable two decades ago can threaten floods today." Id.

Further, as Plaintiffs' expert Dr. Nittrouer explained in his report, several Corps studies published well before February 2013 "ha[d] focused directly on the ORCC, indicating that the allocation of sediment could be unbalanced, thereby leading to shoaling of the mainstem Mississippi River." Def.'s Ex. 37, at 3. He specifically cited a 2011 paper prepared by Nguyen

17

et al. that had "broached this possibility with a study that relied on a physical experiment to simulate ORCC operations." Id.[17] The findings of the authors "include[d] that sediment perpetually accumulates in the outflow channels of the diversion (both the Low Sill and Auxiliary Channels), and that this impedes efficient throughput of water and sediment between the Mississippi and Atchafalaya Rivers." Id. Nguyen et al. concluded that "in all model tests, no operational or structural measures created continuous sustained sediment diversion through the ORCC. In every test, all observed trends indicated that the ORCC did not divert significant bed load into the combined outflow channel." Id. (quoting Nguyen, supra, at 40).

In addition, the record contains unrebutted evidence that, as early as 2011, theories that the ORCS was causing increased flooding had become a topic of discussion among members of the local community. According to bellwether plaintiff Paul Manning, since 2011, he and other farmers "always heard that the control structure down there was silting in and causing the river to basically back up on us and causing the flooding" and that the control structure "was the reason that the floods were happening more frequently and lasting longer." Def.'s Ex. 46, at 17–18, ECF No. 196-6 (P. Manning Dep. at 45:16–46:16). Similarly, Robert W. Manning, III, testified that he heard of a connection between the ORCS and flooding perhaps as far back as 2001. See id. at 21 (R.W. Manning Dep. at 122:8–19).

Finally, the Court notes that Plaintiffs argue that there were three events that occurred in 2017 and 2018 that finally made them realize that ORCS-induced sediment buildup was the cause of the increased flooding occurring on their property. Pls.' Resp. at 22–25. This argument is telling because none of the three events Plaintiffs cite involved the provision of relevant information that was not already either publicly available many years earlier or that could not have been found through reasonable diligence.

The first event Plaintiffs claim informed them that they had a cause of action was the publication of an article in the New Orleans Times-Picayune in December 2017 entitled "Rising River Bottom Could Switch Mississippi to Atchafalaya Riverbed in Next Mega Flood." See Pls.' Ex. 67, at USACE-0186702, ECF No. 204-4. The article reported on research conducted at Louisiana State University by Dr. Yi-Jun Xu. Id. at USACE-0186703. It explained that Dr. Xu's research showed that "the filling of the Mississippi's river[bed] with sediment along an area just below the Old River Control Structure" created the potential for the river to switch its flow to the Atchafalaya River Basin. Id. at USACE-0186704. The article, which Mr. Williams forwarded to several people via email, states that the section of the riverbed at issue had risen more than 30 feet over the preceding 20 years, which left less room for the water flowing to the Gulf. See id.; see also Pls.' Ex. 69, at 32209, ECF No. 204-6 (email forwarding article). "During a major flood," the article explained, "[sediment accumulation in the riverbed] will act like a stopper, causing water to back up and rise higher than the present Old River Control [S]tructures." Pls.' Ex. 67, at USACE-0186704.

---

[17] The full citation for the paper cited by Dr. Nittrouer is Ivan H. Nguyen et al., Mississippi River and Old River Control Complex Sedimentation Investigation and Hydraulic Sediment Response Model Study (2011) [hereinafter Nguyen Report]. See Pls.' Ex. 85, at 2, ECF No. 206-5.

18

Plaintiffs claim that the Times-Picayune article was significant because "[n]o publicly available article prior to [it] had ever reported ORCC-caused sedimentation in the Mississippi River in such clear terms." Pls.' Resp. at 22. But that is not the case. As described above, the 1977 Times-Picayune article and the 1991 New York Times article both discussed the buildup of sediment around the ORCS, its tendency to cause the water levels in the Mississippi to rise, and, in the case of the New York Times article, the flood risk created by the accumulation of sediment. In addition, in 1980, the Louisiana Water Resources Research Institute published a bulletin entitled "If the Old River Control Structure Fails?: The Physical and Economic Consequences," which concluded "[i]dentical weather conditions now produce floods of greater magnitudes and higher river stages." See Def.'s Ex. 33, at 2, ECF No. 195-13. A 1987 article entitled "Atchafalaya" printed in the New Yorker magazine similarly observed that "the Mississippi's main channel . . . had given up a lot of volume to accumulations of sediment" since the ORCS had come online in 1963 and explained that, therefore, "[h]igh water . . . would flow . . . much higher." See Def.'s Ex. 35, at 21, ECF No.195-15. But if, in fact, it was the 2017 article in the Times-Picayune that informed Mr. Williams of his cause of action, it is then unclear why these other publicly available articles published much earlier would not have done so as well.

The second event that Plaintiffs assert informed them of the existence of a cause of action occurred in April 2018, when Nature magazine published an article entitled "Climatic Control of Mississippi River Flood Hazard Amplified by River Engineering." See Pls.' Resp. at 23. According to Plaintiffs, the article described how human intervention over the preceding 500 years "had elevated flood risks on the [L]ower Mississippi River to unprecedented levels." Id. Even so, Plaintiffs' contention that this article somehow informed them that their cause of action existed is simply implausible. The article makes no mention of the ORCS whatsoever; instead, it attributes increased flooding to climatic factors and river engineering modifications other than the ORCS. See generally Pls.' Ex. 75, at 5–8, ECF No. 205-5.

The third event that Plaintiffs reference was a conversation in April 2018 between Mr. Williams and Charles Camillo, Director of the Mississippi River Commission and Executive Assistant for the Corps' Mississippi Valley Division. Pls.' Resp. at 24. According to Plaintiffs, shortly after Mr. Williams mentioned Dr. Xu's work during a hearing held by the Mississippi River Commission, Mr. Camillo approached Mr. Williams and allegedly stated "that he (Mr. Williams) was on to something, and that the Corps had managed the flow at the ORCC correctly but that there were sediment issues." See id. (citing Pls.' Ex. 77, at 113:10–24, ECF No. 205-7 (Camillo Dep.); Pls.' Ex. 41, at 166:3–167:16 (K. Williams, Sr., Dep. II); Pls.' Ex. 78, at 301:13–305:2, ECF No. 205-8 (G. Williams Dep.)).

This conversation, and Mr. Camillo's statement that Mr. Williams was "on to something," may have given Mr. Williams greater confidence in the viability of a cause of action. But no information was provided to Mr. Williams during this exchange that was not already available. The "something" he was on to—that there were "sediment issues" at the ORCS—was not new. And "the law does not insist that one be certain of the existence of a [cause] of action before the statute of limitations may commence running." Mitchell v. United States, 10 Cl. Ct. 63, 67 (1986).

19

Finally, Plaintiffs allege that it is not reasonable to expect that they would have known of their claim before February 2013 because—on several occasions—Corps personnel responded to inquiries about the ORCS by identifying other possible causes for flooding, including increased precipitation. Pls.' Resp. at 17–19. But the mere fact that the Corps identified other possible explanations for the increased severity of the flooding on Plaintiffs' properties did not relieve Plaintiffs of their obligation to conduct their own investigation.

In short, Plaintiffs have not submitted evidence sufficient to demonstrate that they neither knew nor should have known of the events fixing the government's liability for a taking of a permanent flowage easement until after February 2013. The evidence presented shows that the potential for sediment accumulation caused by the ORCS and its impact on river levels had been recognized and discussed within the scientific community, by the Corps, and even in public articles, for decades before these actions were filed. Therefore, the Court finds that a reasonable plaintiff, exercising due diligence, would have been aware of the theory that the ORCS was responsible for the increased flooding of their property more than six years before the bellwether plaintiffs filed their complaints. Therefore, the Court lacks jurisdiction over the takings claims of the bellwether plaintiffs.

## **CONCLUSION**

For the reasons set forth above, the government's cross-motion for summary judgment, ECF No.194, which the Court is treating as a motion to dismiss under RCFC 12(b)(1), is **GRANTED,** and the claims of the bellwether plaintiffs are **DISMISSED** without prejudice. Plaintiffs' motion for partial summary judgment, ECF No. 184, is **DENIED** as moot.

The parties shall file a joint status report proposing further proceedings within thirty days.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge